UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MATTHEW KELLY,

        **Plaintiff,**

                                **Case No. 2:14-cv-00307**

     **v.**                        **JUDGE GREGORY L. FROST**
                                   **Magistrate Judge Norah McCann King**

CLINTON SINES, et al.,

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court for consideration of Defendant Bryan Cook's motion for summary judgment (ECF No. 32), Defendants Clinton E. Sines and Vernon P. Stanforth's (collectively with Cook, "Defendants") motion for summary judgment (ECF No. 34), Plaintiff's response in opposition to both motions (ECF No. 36), Cook's reply memorandum (ECF No. 38), and Sines and Stanforth's reply memorandum (ECF No. 39).  For the reasons that follow, the Court **GRANTS** the motions.

    **I.**       **BACKGROUND**

On May 25, 2013, Plaintiff was the sole passenger in a pickup truck traveling on Interstate 71 ("I-71").  Justin Runck was driving the truck.  Both Plaintiff and Runck were intoxicated, having smoked marijuana and consumed a substantial amount of alcohol in the hours leading up to the events in question.  Plaintiff testified that he and Runck got in the truck around 2:00 a.m. to drive from Columbus, Ohio to Harrison, Ohio.  Plaintiff fell asleep as soon as they got in the truck.

According to witnesses on the road, Runck began driving erratically.  Multiple witnesses reported the truck as being all over the road.

Ohio State Highway Patrol Sergeant Bryan Cook received the reports and, at around 3:00 a.m., he observed the truck on I-71 swerving across lanes.  Cook activated the lights and siren on his vehicle, which initiated the dash camera.  Because the dash camera captured all of the events in question, and because there is no dispute over the authenticity or admissibility of the videotape, the Court views the remaining facts "in the light depicted by the videotape." *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) (quoting *Scott v. Harris,* 550 U.S. 372, 378 (2007)).  The facts set forth below are either described from the Court's viewing of the videotape or are undisputed by the parties.

After Cook activated the lights and sirens on his vehicle, Runck pulled the truck over to the inside median (i.e., to the left of the left lane on I-71).  There were three lanes of traffic to the right of Runck's truck.  Multiple vehicles passed during the ensuing traffic stop.

Cook (in full uniform) approached the vehicle with a flashlight.  Cook suspected that Runck was driving under the influence and radioed for backup.  Cook then asked Runck to step out of the truck and perform several sobriety tests, after which time Cook placed Runck under arrest.  The exchange was cordial despite the circumstances, with both Cook and Runck speaking politely to one another and Runck cooperating with Cook's requests.

After he placed Runck under arrest, Cook searched Runck and found marijuana and rolling papers on his person.  Cook then handcuffed Runck and put him in the passenger seat of Cook's squad car.

2

At this point, backup arrived.  Fayette County Deputy Clinton Sines parked behind Cook's cruiser and exited his vehicle.  Cook asked Sines to watch Runck.  Cook then went back to the pickup truck in order to wake Plaintiff, who had slept through the duration of the stop. Cook asserts that he had to wake Plaintiff in order to identify him and to get him out of the truck, which was to be impounded.

Cook approached the driver's side of the truck.  Shining a flashlight, Cook opened the driver's side door, stated "hey partner, hey," and reached into the truck.  Cook jostled Plaintiff while loudly stating, "hey."

After approximately ten seconds, Plaintiff (who was wearing a hooded sweatshirt with the hood up) awoke and abruptly sat upright, flailing his arms in Cook's direction.  Cook backed away from Plaintiff while yelling, "wake up, get up."  Plaintiff then struggled with the shoulder harness of his seatbelt.

As Plaintiff appeared to free himself from the shoulder harness of his seatbelt, Sines (who had been standing next to Cook's squad car approximately ten feet behind the truck) ran to the passenger side of the truck.  Sines opened the passenger side of the truck while shining a flashlight and yelling "show us your hands now, Sheriff's office."  Sines continued to yell "show us your hands" for the next several seconds.  Cook (who was reaching into the truck from the driver's side) yelled "show us your hands, I know you're asleep now get up."

While yelling "show us your hands," Sines grabbed Plaintiff and began to pull him from the truck.  Plaintiff flailed his arms.  It is unclear from the videotape whether Plaintiff was struggling against Sines' attempt to pull him from the truck or attempting to balance himself as he was pulled from the truck.  At this point, however, it is clear that Plaintiff had freed himself

3

from the shoulder harness of his seatbelt, given that the upper half of his body was completely out of the truck and that he was flailing his arms.  As Sines was pulling Plaintiff from the truck, he (Sines) was standing approximately one foot into the left lane of I-71, the upper half of Plaintiff's body was over the line into the left lane, and Cook was still on the driver's side of the truck but was coming over to the passenger side to assist Sines.

Sines yelled "I'll tase you" as Plaintiff attempted to find his footing, which he did a second or two later.  Plaintiff stood up immediately adjacent to the truck's passenger side as Sines backed up further into the left lane of I-71.  Cook approached the passenger side of the truck just as Sines activated his taser (which was attached to his flashlight).  The taser released two darts, at least one of which struck Plaintiff and caused him to recoil slightly and sway somewhat on his feet.

Sines yelled "get on the ground, get on the ground, now!" as Plaintiff appeared to drift backwards into a sitting position on the truck's passenger seat.  Sines yelled "get on the ground, I'll do it again" as Plaintiff raised his hands to his face and then put his hands behind his head.  Either Sines (who was then standing in the middle of the left lane of I-71) or Cook (who was then standing about a foot into the left lane) said "it's the police," after which Sines continued to yell "get on the ground" as Cook yelled "he said get on the ground."  Plaintiff remained standing upright with his feet on the ground and his hands on or around his head.

At some point during this exchange, Sines activated his taser for a second time.  Plaintiff was leaning backwards on the passenger seat with his feet on the ground outside of the truck and his hands over his face.  Both Sines and Cook were in the middle of the left lane of I-71.  At least

4

one vehicle has passed the officers in one of the two right lanes.  Plaintiff had not said anything up to this point.

While shining his flashlight, Sines tentatively approached Plaintiff while continuing to yell "get on the ground."  Plaintiff appeared to lean back further into the truck.  Sines then grabbed Plaintiff's sweatshirt to pull him out of the vehicle, again yelling "get on the ground."

Plaintiff remained tethered to the truck (but still on his feet) as Sines attempted to pull his sweatshirt.  At this point, Sines asked Cook, "does he still have a seatbelt around him?"  Cook responded, "ahhh, let me see," approached Plaintiff, and saw that Plaintiff was being restrained by his lap belt.  It bears noting that, although it is undisputed that the lap belt was still fastened, it had become very loose at this point such that Sines was able to drag Plaintiff out of the truck and Plaintiff was standing outside of the truck with his feet on the ground.

Cook said "yeah" in response to Sines' question, at which point Sines ceased telling Plaintiff to get on the ground.  Sines instead yelled at Plaintiff to "turn around," and Cook echoed that command.  Sines (who was still standing in the left lane of I-71) yelled, "turn around, face away from me," as Cook said "I'll get it" and went to the driver's side door to unfasten Plaintiff's seat belt.  Plaintiff (who was still standing adjacent to the truck) dropped his hands to his waist.

At this point Plaintiff spoke for the first time.  He said, "ok, ok," raised his hands over his head, turned around to face the inside of the truck, and placed his hands on top of the truck. Sines began to pat Plaintiff's back while continuing to shine the flashlight on him.  Cook said, "hold on, partner," as he reached into the truck to unhook Plaintiff's lap belt from the driver's side.  Plaintiff said, "god damn, dude," as Sines kept a hand on his back.  The entire exchange up

5

until this point, beginning from the time Cook approached the truck to wake Plaintiff, lasted approximately one minute and twenty seconds.

The exchange between the officers and Plaintiff from this point forward was relatively calm, with the officers standing close to the vehicle and Plaintiff complying with the officers' demands.  The officers ceased yelling and spoke in relaxed and conversational tones.

Apparently in an attempt to explain the tasing, Sines told Plaintiff, "you don't come out [swinging]."  Plaintiff responded, "no I didn't," and Sines responded, "yeah you did."  Cook stated, "that's why he did it."  Plaintiff again stated, "god damn, buddy," "no," and some iteration of, "I didn't swing at nobody, brother."

After the officers patted Plaintiff down, they led him out of the truck.  Plaintiff stated several times, "I did not swing at nobody, sir," as the officers placed him in handcuffs on the side of the truck.  Plaintiff was slurring his words and speaking somewhat incoherently at this point. Cook, again speaking politely given the circumstances, told Plaintiff in a calm voice, "listen, that's why he tased you, because you came out swinging."  As Plaintiff repeatedly slurred, "sir," Cook stated, "obviously you're intoxicated, listen, listen, yes you did."

The officers then walked Plaintiff to the back of the truck.  Sines can be heard speaking into his radio to report having used his taser.  Cook sat Plaintiff on the bumper of the truck, stating: "you're going to sit on the bumper here because we're going to get out of traffic a little bit.  We don't get paid to get hit."  The officers, for the first time since approaching the passenger side of the vehicle, then moved out of the left lane.  It bears noting that several vehicles had passed in the middle and right lanes during the incident.

6

Plaintiff then stated to Cook, "my eye hurts."  Cook informed Plaintiff that Sines was getting a medic and stated, "you moved when he tased you."  Cook then can be heard speaking into the radio, saying something along the lines of, "they tased him once, got him up above the eye."

The officers searched Plaintiff and the truck as they waited for medical personnel to arrive.  Cook explained to Plaintiff what had happened, including how he stopped Runck, attempted to wake Plaintiff, and how Plaintiff began swinging as he woke up.  Plaintiff informed Cook that something was "sticking out of his eyelid," to which Cook responded that medical personnel were on their way.

At this time, Cook returned to Runck in his squad car.  Runck apologized for Plaintiff, stating, "I'm sorry, I didn't know he was gonna do that."  Cook informed Runck that Plaintiff got tased because he "came up swinging," to which Runck responded, "I know, I saw that."  At some point later in the conversation, after Runck asked what the officers planned to do with Plaintiff, Cook responded that "they'll [presumably referencing Sines] probably end up taking him to jail." Runck stated, "because he got up like that," and Cook responded, "yeah."  Runck stated, "I understand."  The officers, Plaintiff, and Runck awaited medical personnel without further incident.

Plaintiff was treated by paramedics and was subsequently transported to the hospital.  A brief description of the taser at issue is helpful to understand the extent of Plaintiff's injuries. Sines described (and Plaintiff does not dispute the description) the taser as follows:

> At the time of the stop, Deputy Sines was equipped with an X26 Taser ("X26").
> The X26 fires two small dart-like cylinder electrodes into the skin of the target.
> The electrodes stay connected to the main unit, and serve as the conduits to send

electrical current into the target, temporarily "stunning" the target, allowing the officer to then secure the target. The electrodes fix themselves in the skin or clothing with small barbs. These barbs are designed to be easily removed once the target is secured. Police users, including Deputy Sines, are trained to fire the barbs at the center mass of the body, or the torso.

(ECF No. 34, at PAGEID # 736 (internal citations omitted).)  It is undisputed that Sines was certified and trained to use the X26 taser at the time of the stop.

It similarly is undisputed that one of the taser's prongs struck Plaintiff in his right eye. Despite undergoing surgery to repair the damage to his eye, Plaintiff is (according to him) now blind in his right eye.  Other than Plaintiff's injury, the parties do not provide any additional information about the aftermath of the traffic stop, such as whether Plaintiff was charged with and/or prosecuted for any crimes.

Almost a year after the incident in question, Plaintiff filed the lawsuit that is currently before the Court.  Plaintiff brings his first two claims under 42 U.S.C. § 1983 for excessive force (against Sines) and "excessive force – failure to intervene" (against Cook).  (ECF No. 1 at PAGEID # 5.)  Plaintiff also brings a state-law claim for battery against Sines and his supervisor, Fayette County Sheriff Vernon Stanforth (on a theory of respondeat superior).  Finally, Plaintiff brings a claim for negligent retention and supervision against Stanforth.  Plaintiff seeks an award in excess of $5,000,000.

Defendants now move for summary judgment on each of Plaintiffs' claims.  The Court will address the parties' arguments below.

## II.     DISCUSSION

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court therefore may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234–35 (quoting *Anderson*, 477 U.S. at 251–52).

### B.  Analysis

##### 1.  *Excessive Force Under § 1983 (Counts I and II)*

Section 1983 provides a cause of action against any person who, under color of law, subjects another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  Plaintiff alleges that Sines and Cook deprived him of his Fourth Amendment right to be free from excessive force.

Sines and Cook, however, invoke the affirmative defense of qualified immunity, which shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "  *Kirby v. Duva*, 530 F.3d 475, 481 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Courts employ a two-pronged inquiry, which can be addressed in any order, to determine whether qualified immunity applies.  *See, e.g., Murray-Ruhl v. Passinault*, 246 F. App'x 338, 342 (6th Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)); *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).   "[T]he reviewing court must ask: taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* (internal quotations omitted).  "If a constitutional right was violated, the next, sequential step is to ask whether the right was clearly established."  *Murray-Ruhl*, 246 F. App'x at 342–43.  The right must be "clearly established" in the "more particularized, relevant sense" of the "specific context of the case."  *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002).  Although a plaintiff need not offer precedent with "materially similar facts," the precedent must give "fair warning" that the action in question is unconstitutional.  *Id.*

10

In essence, "qualified immunity is inappropriate if it would be clear to a reasonable officer that his conduct was unlawful." *Murray-Ruhl*, 246 F. App'x at at 343. "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.' " *City and Cty of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2083 (2011)).

      a.  <u>First Prong: Constitutional Violation</u>

The Court first addresses the constitutional violation prong of the qualified immunity analysis. The question is whether the facts, viewed in the light most favorable to Plaintiff, support Plaintiff's claim that Sines and Cook violated his Fourth Amendment right to be free from excessive force.

The parties agree that the Fourth Amendment's "objective reasonableness" standard governs the constitutional analysis in this case. The Supreme Court's opinion in *Graham v. Connor* defines the boundaries of "reasonable" force:

> Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. . . . Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including **the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight**. . . .

490 U.S. 386, 396 (1989) (emphasis added) (internal quotations and citations omitted).

The *Graham* court went on to caution that:

11

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.*

    b.  Active Resistance

Courts analyzing the third *Graham* factor—whether a subject is actively resisting arrest or attempting to evade arrest by flight—have drawn a line between subjects who are actively resisting arrest and those who have already been restrained.  *See, e.g., Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012).  It is reasonable for an officer to tase a subject who is actively resisting arrest and/or refusing to be handcuffed.  *Id.*; *see also Williams v. Sandel*, 433 F. App'x 353 (6th Cir. 2011) (finding it reasonable to deploy a taser thirty-seven times on a suspect who was preventing officers from securing him and who eventually broke free from the officers and ran down a highway).  It is unreasonable, however, to gratuitously tase a suspect who is compliant or who has already been subdued.  *See, e.g., Kijowski v. City of Niles*, 372 F. App'x 505, 509 (6th Cir. 2010) (tasing a suspect who is sitting in a truck not disobeying police commands or posing a danger to officers constitutes excessive force); *Landis v. Baker*, 297 F. App'x 453, 464 (6th Cir. 2008) (finding excessive force when officers used a taser "in stun mode, in rapid succession on a suspect who is surrounded by officers, in a prone position in a muddy swamp, who has only one arm beneath him, and who has just been struck several times with a baton").

A suspect's resistance to an officer's commands is relevant to an excessive force analysis even if the suspect was not under arrest.  In *Caie v. West Bloomfield Township*, for example, the Sixth Circuit confronted a fact pattern in which the plaintiff had consumed a large quantity of alcohol and drugs and had expressed suicidal thoughts to a family member.  485 F. App'x 92, 96 (6th Cir. 2012).  When officers arrived on the scene, the plaintiff was acting erratically, refusing to cooperate with the officers' commands, and making comments about fighting the officers so they would have reason to kill him.  *Id*. at 94–95.  The officers then tased the plaintiff in order to get him under control so they could transport him to the hospital.  *Id*.  In affirming the district court's decision that there was "enough resistance" from the plaintiff to justify the officers' use of a taser, the Sixth Circuit stated:

> Although Plaintiff insists that he no longer posed a risk of harm or flight after being taken to the ground, there is no dispute that Plaintiff continued to be uncooperative by actively resisting the officers' attempts to secure his arms behind his back. In light of this resistance, we find that [the officer's] single use of the taser in drive-stun mode was not gratuitous. Rather, it served the purpose of gaining control over a highly intoxicated, volatile, and uncooperative subject and neutralizing what a reasonable officer could perceive as a dangerous situation. We find that [the officer's] use of force under these circumstances did not violate Plaintiff's constitutional rights.

*Id*. at 97.

It is important to note that the issue of resistance must be viewed objectively from the perception of a reasonable officer on the scene.  The question is whether a reasonable officer would infer resistance at the time of the incident—and not whether the plaintiff can demonstrate after the fact that he was not actually resisting.  *See Hightower v. City of Columbus*, No. 2:12-cv-437, 2013 WL 59632515, at *12 (S.D. Ohio Nov. 7, 2013) (affording qualified immunity to an officer who tased a suspect who was "flailing" during a struggle and was not complying with the

13

officers' commands, despite the fact that the plaintiff later claimed that he was not resisting and that it was impossible for him to control his body at the time).

### 2. Immediate Threat

Regarding the second *Graham* factor—whether a suspect poses an immediate threat—courts again engage in a fact-specific inquiry.  The Sixth Circuit has recognized that the location of the incident is important to this analysis.  For example, although it may be reasonable to tase a suspect that officers encounter at or around a highway (given the threat to officer safety and the safety of passing motorists), it is unreasonable to tase a suspect who runs from a highway and is eventually subdued in nearby woods.  *Compare Williams v. Sandel*.  433 F. App'x 353, 358–60 (6th Cir. 2011) (finding it objectively reasonable to tase a suspect who was running naked alongside a highway at night, after the suspect prevented the officer from handcuffing him and refused to comply with the officers' commands to get on the ground) *with Landis*, 297 F. App'x at 456–64 (finding it objectively unreasonable to tase a suspect who had exited his vehicle and ran on a highway but eventually ran to the woods and was being pinned by officers face down in the mud).  The *Williams* court specifically recognized the safety threat inherent in securing a noncompliant suspect on the side of a highway, stating: "[the suspect] created a risk of serious harm by virtue of the location and his actions . . . there is some risk inherent in standing alongside traffic moving at such high speeds, especially when there is an individual involved who has been engaging in bizarre and highly erratic behavior."  433 F. App'x at 361.

Other courts have acknowledged a suspect's "erratic" behavior in concluding that a threat existed that justified the use of force.  *See id*.; *see also Caie*, 485 F. App'x at 96.  *Cf. Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007) ("The diminished capacity of an unarmed detainee

14

must be taken into account when assessing the amount of force exerted.")  The calculus of reasonableness in such cases must account for the fact that the officer cannot anticipate the suspect's next move.

Finally, in considering the threat that an officer faced at the time he or she used force on a suspect, courts also consider the duration of the incident.  As this Court previously found in *Hightower v. City of Columbus*, an encounter lasting "between approximately 50 and 70 seconds" means "that officers had to make extremely swift decisions about how to react."  2013 WL 5963215, at *11.  This Court found that the quick duration of the incident in *Hightower* made it reasonable to deploy a taser three times on a suspect who was resisting other officers' attempts to arrest him.  *Id*.

3.  Other Factors

If a court concludes that an officer was justified in using force, the next step of the analysis is to determine whether the amount of force used was excessive under the circumstances.  Relevant factors include the type of force used (i.e., a taser as opposed to a gun), the number of times the taser was deployed, and the length of time the taser was activated, among other factors.  *See, e.g., Griffith v. Coburn*, 473 F.3d 650, 657 (6th Cir. 2007) (considering the fact that a neck restraint technique "falls toward the harder or more violent part" of the use of force continuum in holding that the officer acted unreasonably in using the technique); *Walker v. City of Cookeville*, No. 2:12-00059, 2014 WL 919249, at *10 (M.D. Tenn. Mar. 7, 2014) (noting that, although it was unclear whether two taser cycles were necessary to subdue the suspect, the court could not conclude that the additional cycle violated clearly established law).  And although at least one panel of the Sixth Circuit has stated that the degree

15

of injury is relevant to this inquiry, *see Landis*, 297 F. App'x at 462, other panels have held that, "[i]n determining whether there has been a violation of the Fourth Amendment, we consider not the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence." *Hagans*, 695 F.3d at 304 (holding that an officer did not violate a suspect's Fourth Amendment rights by tasing him, even though the shock from the taser contributed to the suspect's death) (quoting *Miller v. Sanilac Cnty*., 606 F.3d 240, 252 (6th Cir. 2010)).

4.  Application to this Case

Applying these factors to the facts of this case, the Court finds that Sines' conduct in deploying his taser twice was objectively reasonable under the circumstances.  Several points support this conclusion.

First, it goes without saying that Sines, Cook, and Plaintiff all faced an immediate risk of harm due to the location of the incident in or near the left lane of an interstate highway. Regardless of whether Plaintiff woke up flailing his arms because he was acting violently or because he was startled, the officers faced a situation in which Plaintiff was making erratic, rapid movements in an attempt to unhook his shoulder harness and possibly exit the truck.  Multiple vehicles passed the truck during this time, driving at speeds typical of an interstate highway, meaning that both Plaintiff and the officers faced a real and serious risk of being hit.  This risk was especially acute for Sines, who had no way to approach Plaintiff's side of the truck without positioning himself directly in the left lane of the highway.  That the incident took place in the middle of the night only amplified this risk.

The weakness of Plaintiff's argument on this point is telling.  In arguing that no threat of harm existed, Plaintiff argues that "no car ever passed by in the lane the officers ended up

standing in." (ECF No. 36, at PAGEID # 849.) This is a true statement; however, had a car passed by in the left lane of I-71, Sines almost certainly would have been killed. It goes without saying that the fact that Sines lived does not negate the risk he faced at the time.

Plaintiff's arguments that "few cars even passed by the next lane over" and that "traffic was very light" given that the incident took place between 3 and 4 a.m., (*id.*), are similarly unpersuasive. There is a risk inherent in standing in the left lane of an interstate highway while traffic passes, regardless of whether traffic is light or heavy at the time. *See Williams*, 433 F. App'x at 361. The fact that multiple vehicles passed during the eighty-second incident also undermines Plaintiff's argument on this point.

Plaintiff spends much of his brief arguing that no real risk existed because he was strapped into the lap belt of his seatbelt at the time he was tased. This argument fails for several reasons. First, this argument is only relevant if a reasonable officer would have known that Plaintiff's lap belt was secured. But the Court cannot draw that conclusion in light of the video evidence that it was dark out, that Plaintiff was wearing a large sweatshirt, that he had clearly freed himself from the shoulder harness of the seatbelt, and that he was standing completely outside of the vehicle with his feet on the ground at the time he was tased.

In arguing that a reasonable officer would have "had a clear and unobstructed view of the fact that Plaintiff was stuck in his seatbelt," Plaintiff does not address any of these facts. Instead, Plaintiff argues that the video, "viewed frame by frame," shows that he was wearing his seatbelt. (ECF No. 36, at PAGEID # 835 n.2, PAGEID # 841 n.14.) But this statement is a perfect example of an attempt to analyze a situation "with the 20/20 vision of hindsight" rather than

from the "perspective of a reasonable officer on the scene" (in which "frame by frame" analysis obviously was not available).  *Graham* counsels against this course of action.  490 U.S. at 396.

Finally, even if a reasonable officer would have seen Plaintiff's lap belt, that fact would not alter the Court's analysis.  It is undisputed that the lap belt had become so loose that Plaintiff was completely out of the vehicle with his feet on the ground at the time he was tased.  Sines was standing in the middle of the left lane of I-71 at this time.  Plaintiff's erratic movements (regardless of whether they were an "involuntary reaction to an involuntary loss of balance," as Plaintiff claims (*id*. at PAGEID # 842)) still posed a risk of harm to both him and the officers.  Had he flailed at Sines the same way he flailed at Cook, for example, Sines faced a real risk of harm from traffic in the left lane or even in the middle lane if he was forced to jump backwards to avoid Plaintiff's arms.  The fact that the lap belt was still fastened at the time would have made little difference.  The Court therefore concludes that Sines faced an immediate risk of harm at the time he deployed his taser that justified the use of force.

The short duration of the incident (approximately one minute and twenty seconds) further supports this conclusion.  Like the officer in *Hightower*, Sines was forced to act quickly to control a suspect who had either flailed his arms or swung at another officer on the side of an interstate highway in the middle of the night, who had just freed himself from his shoulder harness perhaps in an attempt to exit his vehicle into the left lane of the highway, and who was possibly intoxicated given that the driver of the vehicle had just been arrested for driving under the influence.  A reasonable officer could have assumed at that time that a swift decision was necessary in order to gain control of a dangerous situation.  Plaintiff's after-the-fact description of the incident, such as his arguments that he was not swinging at Sines but was instead moving

18

his arms involuntarily, and that he was actually shifting backwards away from Sines, does not change the fact that a reasonable officer on the scene would have perceived an immediate risk. *See Hightower*, 2013 WL 59632515, at *12 (rejecting a plaintiff's arguments that he did not intend to resist because he was flailing involuntarily and reaffirming the principle that only the perception of a reasonable officer on the scene is relevant).

Having concluded that Sines was justified in using force against Plaintiff, the next issue is whether the force Sines used was excessive under the circumstances.  Plaintiff makes two arguments on this point: (1) that Sines acted excessively by deploying the taser a second time, and (2) that Sines acted excessively by targeting Plaintiff's face.

Regarding the first argument, the Court agrees with Defendants that the second taser cycle did not violate Plaintiff's constitutional rights.  It is undisputed that Sines ordered Plaintiff to "get on the ground" following the first taser cycle.  It similarly is undisputed that Plaintiff did not comply with that command, make any indication that he was trying to comply, or convey to Sines that he was unable to do so.  The Court finds that this noncompliance, combined with the continued threat of being struck by a passing motorist, made the second taser cycle objectively reasonable. *Cf. Caie*, 485 F .App'x at 96 (holding that a suspect's noncompliance with an officers' commands in a potentially dangerous situation justified the officer's decision to tase the suspect).  That is especially true in light of the fact that Plaintiff was not subdued at the time of the second taser cycle such that it was not gratuitous force. *See, e.g., Hagans*, 695 F.3d at 509 (discussing the line between necessary force and gratuitous force).  In fact, Plaintiff only became compliant and began speaking to the officers after being tased for the second time, which

suggests that the two taser cycles had their intended effect of diffusing and controlling the situation.

Plaintiff's second argument similarly fails to convince the Court that the force used against him was excessive. The Court acknowledges that, in certain cases, targeting an individual's face can make otherwise acceptable force excessive. *See, e.g., Baker v. City of Hamilton*, 471 F.3d 601, 609 (6th Cir. 2006) (finding that an officer's strike to an individual's head was excessive when the officer "could have struck [the suspect] in another, less sensitive part of [the suspect's] body"). But that principal does not apply to the facts of this case. Although Plaintiff argues that "[f]rame by frame [video] analysis shows clearly that Sines [sic] red laser dot moved up onto the Plaintiffs [sic] neck then further up past the neck to Plaintiffs [sic] face," (ECF No. 36, at PAGEID # 844), the Court's review of the video evidence in real time simply does not support that conclusion. It is clear from the video that Plaintiff was moving and flailing (either voluntarily or involuntarily) at the time he was tased. The tasing took place within a matter of seconds of Plaintiff being pulled from the truck. A reasonable jury could not conclude from this evidence that Sines "targeted" Plaintiff's face. As such, the *Baker* court's reasoning that the officer could have struck the suspect in a less sensitive area does not apply.

Having considered the parties' arguments and relevant case law, the Court concludes that Sines' use of force was objectively reasonable under the circumstances. Sines therefore is entitled to qualified immunity with respect to Plaintiff's § 1983 claim.

The Court reaches the same conclusion regarding the "failure to intervene" claim against Cook. Having found no constitutional violation, the § 1983 claim against Cook necessarily fails. Summary judgment is warranted on Counts One and Two of Plaintiff's Amended Complaint.

20

      2.      *State Law Claims Against Sines and Stanforth (Counts III & IV)*

The Court next addresses the state-law claims against Stanforth.  In response to Stanforth's argument that he is immune from liability for the wrongful acts of his employees, Plaintiff concedes that his battery claim against Stanforth is without merit.  Plaintiff does not address Stanforth's argument that he is immune from liability for Count VI (negligent retention and supervision).  Plaintiff therefore fails to meet his burden in setting forth evidence to establish the essential elements of his claims against Stanforth.  Summary judgment is warranted.  *See Muncie Power Prods., Inc.*, 328 F.3d at 873.

Summary judgment is also warranted with respect to Count III against Sines.  It is well settled that employees of political subdivisions (such as Fayette County Deputy Sines) are entitled to immunity pursuant to Ohio Revised Code § 2744.03(A)(6) for actions taken within the scope of their employment, unless an exception to the statute applies.  Plaintiff asserts that the exception set forth in § 2744.03(A)(6)(b) applies because Sines acted "with malicious purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code § 2744.03(A)(6)(b).

The Court, however, agrees with Defendants that there is no evidence to support Plaintiff's claim.  Plaintiff asserts that a jury could find that Sines acted maliciously for the same reasons he offered in support of his § 1983 claims:  that Sines tased Plaintiff knowing he was restrained by his seatbelt, gratuitously administered a second taser charge, and targeted Plaintiff's head, all while facing a situation that did not threaten his (Sines') safety.  But as explained above, the video evidence simply does not support this characterization of the incident.  The video instead demonstrates that Sines acted in an objectively reasonable manner by tasing Plaintiff twice in order to control a rapidly-unfolding and potentially dangerous situation.

21

Because the Court concludes that Sines acted reasonably as a matter of law, it rejects Plaintiff's argument that the issue of whether Sines acted maliciously should be decided by a jury.  Sines therefore is immune from liability with respect to Plaintiff's state-law battery claim.

**III.     CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendants' motions for summary judgment.  (ECF Nos. 32 & 34.)  The Clerk is **DIRECTED** to enter judgment accordingly and terminate this case from the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED**.

**/s/ Gregory L. Frost**
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**